IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DANA SWENSON, | ] |
| Plaintiff, | ] |
| vs. | ] Case No: 3:23-CV-590 |
| ATCO INDUSTRIES, LLC, | ] JURY TRIAL |
| Defendant. | ] |

**PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dana Swenson ("Ms. Swenson") files this Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. Defendant's motion contains several factual and legal inaccuracies and omissions and must be denied.

**I. STATEMENT OF RELEVANT FACTS**

a. Ms. Swenson's Employment with ATCO

Ms. Swenson began her employment with ATCO in March of 2021 as a Project Coordinator. (Swenson Dep. at 11:20-23; 12:14-16; 15:14-17). Throughout her employment, Ms. Swenson reported to Karen Brotherton, Senior Operations Manager, and Chellie Rhoden, Regional Manager. (*Id.* at 12:23-13:5, 13:17-18; Brotherton Dep. at 18:1-3). About a month after Defendant hired Ms. Swenson, she disclosed that she had a medical condition to her supervisor, Ms. Brotherton. (*Id.* at 69:22-70:6). Specifically, Ms. Swenson told Ms. Brotherton that she had a heart monitor related to her medications and medical conditions, including PTSD. (*Id.* at 70:9-12; 71:25-72:2). At that time, Ms. Swenson informed Ms. Brotherton that she would need time off for

1

doctor's appointments related to her disability. (Pl. SAMF ¶ 1). Ms. Swenson's PTSD, in it's unmitigated form interfered with the major life activity of focusing. (Swenson Dep. at 71:25-72:2).

Ms. Swenson's job duties included managing a team of 5 to 25 people. (Brotherton Dep. at 33:5-9). More specifically, Ms. Swenson trained staff and leadership. (*Id.* at 33:14-18). Ms. Swenson's position required between 40 and 50 hours per week, much of which included traveling. (Swenson Dep. at 23:9-15). However, Defendant did not make Ms. Swenson aware of this fact until about halfway through her first year of employment. (*Id.* at 23:16-22). Defendant regarded Ms. Swenson's job performance as "exemplary." (Pl. SAMF ¶ 2). However, Defendant noted the **only** downfall of Ms. Swenson's performance being her time off. (Pl. SAMF ¶ 3). Ms. Swenson's time off was related almost entirely to her disability. (Ex. A; Ex. B; Ex. C; Brotherton Dep. at 31:5-13; 74:2-11; Swenson Dep. at 71:20-72:4; 72:7-16).

Ms. Brotherton only ever received one phone call from a client during Ms. Swenson's employment that Ms. Swenson was not physically present as expected after a shift she was training had failed to show up. (Brotherton Dep. at 50:4-51:5; 52:19-21). However, Ms. Brotherton noted that on a typical day, after auditing the first shift, Ms. Swenson was free to leave and come back and check on things as needed. (*Id.* at 52:15-18).

b. Defendant's Policies and Procedures

ATCO employees receive no formal handbook training. (Eckles Dep. at 17:24-25). The handbook also does not provide any specific contact information for Defendant's human resources. (*Id.* at 17:17-23). An employee may notify ATCO of their disability by simply letting their supervisor know, at which time their supervisor should tell HR and document it in the employee file. (*Id.* at 34:21-35:3). Informing ATCO of a disability verbally is sufficient. (*Id*. at 35:4-9). ATCO employees do not receive training on what would constitute a reasonable accommodation.

(*Id.* at 36:8-10). An accommodation can be granted without a doctor's note. (*Id.* at 37:2-3). Defendant testified that in response to a complaint about not receiving an accommodation, all Defendant would be required to do is add HR to the email and "hear[] an employee out." (*Id.* at 34:4-11).

Defendant's procedure for employee complaints involves first reporting to your immediate supervisor. (Brotherton Dep. at 22:8-15). However, when an employee has a complaint about their direct supervisor, they are permitted to go higher in the chain of command. (*Id.* at 22:15-17). The supervisor who receives the report then takes a statement from the employee and forwards that statement to HR. (*Id*. at 22:20-23).

Defendant has a five-point attendance policy. (*Id*. at 23:8-11). When an employee reaches five points, Defendant reserves the right to terminate. (Eckles Dep. at 31:22-32:2). Specifically, each call out absence or arrive late or leave early by more than 30 minutes is one point. (Brotherton Dep. at 23:11-14; 23:25-24:4). A no call, no show is automatically four points. (*Id.* at 25:1-2). After five of these call outs, the employee is terminated. (*Id.* at 23:16-18). Employees can also accrue half points for being up to 15 minutes late or leaving up to 15 minutes early. (*Id*. at 23:23-25). However, salaried employees are not required to sign in and sign out each day. (*Id.* at 24:5-9). Each 90 days, this tally resets. (*Id*. at 23:19-22). There are no exceptions to the point policy. (*Id*. at 24:19-22).

Defendant is unaware of whether or not their policy is written to warrant absence "points" when an employee is absent with a doctor's note. (Eckles Dep. at 29:21-25). However, during Ms. Swenson's employment, Leslie Rachelle clarified that Ms. Swenson would still get a point for an absence related to an asthma attack even if she had a doctor's note, which she did. (Ex. A; Ex. B).

    c. <u>Defendant's Pattern of Discrimination</u>

On March 3, 2022 Ms. Swenson emailed Chellie Rhoden and Ms. Brotherton at 3:00am letting them know that she would be unable to come into work as a result of an asthma attack and need for breathing treatments. (Ex. B). Ms. Brotherton then sent the email to Rachelle Leslie in HR. (Brotherton Dep. at 27:18-23). As a result of this absence, Ms. Rhoden covered Ms. Swenson's job duties. (*Id.* at 28:10-17). Ms. Leslie then wrote back to Ms. Brotherton and Ms. Rhoden, "Do you guys have her on the five-point policy?" (Ex. B). When Ms. Brotherton responded in the affirmative, Ms. Leslie then wrote "Where is she at? She has to be close, right? Remember, call off is a call off. It doesn't matter if they bring a doctor note. It still gets a point." (Ex. B). Ms. Brotherton confirmed in her deposition that this is what she understood Defendant's policy to be. (Brotherton Dep. at 29:17-19). Despite Ms. Swenson ultimately providing a doctor's note for this absence, she still received an attendance point. (*Id.* at 29:20-25).[1]

The March 3, 2022 absence was Ms. Swenson's third attendance point. (Ex. B). Ms. Brotherton noted in email that "I normally don't have to track my salaried [Project Coordinators], but after all our issues, we started." (Ex. B). Ms. Brotherton clarified that these "issues" with Ms. Swenson included a time when she had some heart problems. (Brotherton Dep. at 31:5-13).

Ms. Brotherton testified that Defendant allowed Ms. Swenson to have time off every time she asked. (Brotherton Dep. at 32:1-6). This is false. Periodically throughout Ms. Swenson's employment she would be asked to reschedule her doctor's appointments. (Swenson Dep. at 78:18-23). If Ms. Swenson asked for time off for a doctor's appointment and was told no, she would still attend work and would not leave early. (*Id.* at 112:2-8). In fact, it was Ms. Swenson's testimony that she was never allowed to leave early. (*Id.* at 112:14-16).

---

[1] Ms. Brotherton noted in her deposition that Ms. Swenson was "very good at providing her doctor's notes." (Brotherton Dep. at 30:2-3).

### d. Ms. Swenson's Requests for Accommodation

As early as August 11, 2021, Ms. Swenson notified Defendant of her need for Inpatient Mental Health Treatment related to her mental illness, including PTSD. (Ex. C; Brotherton Dep. at 74:2-11). Ms. Swenson's mental illness and PTSD, in it's unmitigated or untreated state substantially limits the major life activities of breathing, sleeping, and working. (Ex. A; Ex. C). Defendant understood this note to mean Ms. Swenson was being treated for her mental health. (Brotherton Dep. at 75:13-19). This note was sent directly to HR. (*Id.* at 75:20-22).

In December 2021, Ms. Swenson asked Chellie Rhoden, another supervisor, for time off because of a Post Traumatic Stress Disorder episode. (Swenson Dep. at 71:20-72:4). Ms. Swenson needed the time off in order to see her doctor and therapist and avoid a mental health crisis. (*Id.* at 72:7-16).

Ms. Swenson typically attended in-person therapy once every two weeks. (*Id.* at 72:17-23). When Ms. Swenson made therapy appointments, she gave Defendant notice the day she scheduled the appointment and a week prior as a follow up. (*Id.* at 75:24-76:3). Ms. Swenson reminded Defendant, specifically Ms. Rhoden, both in person and via text. (*Id.* at 76:4-6; 76:11-14). When informing Defendant of these appointments, Ms. Swenson made clear to Defendant that attending the appointments would be essential in order to maintain her medications and manage her disability. (*Id.* at 77:15-19). Ms. Swenson also asked to leave early for doctor or therapy appointments and was denied this accommodation as well. (Pl. SAMF ¶ 6). Defendant required Ms. Swenson to reschedule appointments because they claimed not to have coverage for Ms. Swenson's job role. (Swenson Dep. at 77:9-15; 77:25-78:6). Even when Ms. Swenson clarified that the appointments were extremely important for her to get needed medication, Defendant maintained their position that Ms. Swenson could not have any time off to attend them. (*Id.* at

115:19-23; 120:4-9). As a result, Ms. Swenson was forced to cancel appointments and was unable to maintain her prescriptions. (*Id.* at 112:17-20; 120:10-13). On at least one occasion, this caused Ms. Swenson to go without a therapy appointment for approximately a month and a half. (*Id.* at 78:10-13). Each time Defendant required Ms. Swenson to forego a doctor's appointment they cited a lack of coverage for the reasoning. (*Id.* at 128:17-129:3).

In or around February 2022, Ms. Swenson requested two days off from her travel position in order to see her therapist. (*Id.* at 31:18-32:2). Defendant declined this request, citing that no one else wanted to cover for her. (*Id.* at 32:1-2; 32:6-8). Ms. Rhoden also told Ms. Swenson that she could not leave the facility she had been assigned to in Alabama to go pick up medications despite Ms. Swenson informing her that she had begun going through withdrawals. (Pl. SAMF ¶ 5). Ms. Swenson does not recall ever being told she would be permitted time off to attend medical appointments. (Pl. SAMF ¶ 7). If Ms. Swenson did not attend these appointments, she risked going without medication and entering withdrawals, which would render her unable to work and in need of inpatient mental health treatment or other crisis intervention, a fact Ms. Swenson made Defendant aware of. (Ex. C; Ex. D).

On March 7, 2022, Ms. Swenson sent an email to Ms. Brotherton that she had begun experiencing withdrawals from her medications. (Ex. D). Ms. Swenson explained in this email that the withdrawals had occurred because she could not get time off to go to her pharmacy. (*Id.*; Ex. A). This resulted because Ms. Rhoden told Ms. Swenson she could not leave the Alabama facility to go pick up medications, despite Ms. Swenson informing Ms. Rhoden that she was currently going through withdrawals. (Pl. SAMF ¶ 5). In order to have her prescriptions filled, Ms. Swenson would need to travel to Tennessee, as her prescriber could not call in prescriptions across state lines. (Swenson Dep. at 181:4-12).

e. Effects of Ms. Swenson's Absences

Ms. Brotherton testified that when Ms. Swenson was absent, the business would be negatively affected because Ms. Brotherton then had to "drop everything" and find coverage. (Brotherton Dep. at 32:15-23). Defendant employs a "traveling team" which are assigned to jobs on an as-needed basis. (Pl. SAMF ¶ 8). One of the primary duties of the traveling team is to fill in for absent employees. (Pl. SAMF ¶ 9). These team members could be moved around as often as every day. (Pl. SAMF ¶ 10). These team members do not require any notice. (Pl. SAMF ¶ 11).

f. Ms. Swenson's Complaints to ATCO

In August 2021, Ms. Swenson sent a text message to Ms. Brotherton explaining that when she is off her medication it pushes her to the "dark side of mental health." (Ex E; Brotherton Dep. at 78:1-6). Ms. Swenson reported to Defendant's human resources department to JD, the operations manager for Defendant, that her depression had worsened, and she needed help with getting time off in order to get help. (Pl. SAMF ¶ 12). JD told Ms. Swenson that he would investigate the issue. (Swenson Dep. at 88:20-22). When Ms. Swenson did not hear back from JD in December 2021, she then reported to Defendant's human resources that her concerns had not been properly addressed. (Pl. SAMF ¶ 13). Defendant then connected Ms. Swenson with Stan Patterson. (Swenson Dep. at 89:19-25). Ms. Swenson first emailed Mr. Patterson and then followed up with a phone call, at which time Ms. Swenson discussed her doctor's appointments. (Swenson Dep. at 102:19-103:2).

Ms. Swenson felt the issues were so severe that on November 30, 2021, she wrote to JD that she was "at the point where [she] dread[s] going to work or where I'm afraid of repercussions because of who I work alongside from time to time." (Ex. F). Ms. Swenson again communicated

her concerns about retaliation to Stan Patterson on December 17, 2021, writing "I don't want to be treated differently because I reported concerns following the chain of command. (Ex. G).

On February 15, 2022, Ms. Swenson emailed Ms. Brotherton and Ms. Rhoden and asked for a meeting to discuss concerns she had. (Ex. H). Ms. Swenson then met with Ms. Rhoden and Ms. Brotherton at a coffee shop. (Brotherton Dep. at 97:21; Swenson Dep. at 128:3-16).

On March 7, 2022, Ms. Swenson emailed Ms. Brotherton about her absences and withdrawals she had experienced as a result of not taking necessary medications or attending necessary doctor's appointments because of her work schedule. (Ex. I). Defendant then acknowledged that this email constituted Ms. Swenson complaining about not receiving accommodations. (Pl. SAMF ¶ 14). Defendant further testified that this email appeared to be relating to a previous request for accommodation. (Eckles Dep. at 33:11-12).

      g. <u>Ms. Swenson's Constructive Discharge</u>

Ms. Swenson's employment with ATCO ended around the beginning of April 2022 when she submitted her resignation. (Ex. J; Swenson Dep. at 31:8-12). Ms. Swenson's mental health condition declined so severely, that in May 2022 she reported to her psychiatrist that she had quit her job due to uncontrolled stress. (Pl. SAMF ¶ 16). Ms. Swenson also stated in her resignation letter that the environment was unfair, overall mentally unhealthy, and toxic. (Ex. J).

Prior to her resignation, Defendant began issuing attendance points to Ms. Swenson when she had planned absences supported by doctor's notes. (Ex. B). Defendant began contemplating whether or not Ms. Swenson was getting close to five points, the time at which termination becomes warranted, on March 3, 2022. (*Id.*). Additionally, during Ms. Swenson's employment, Ms. Rhoden told Ms. Swenson that she "probably [doesn't] have a job." (Ex. L).

No one from Defendant reached out to Ms. Swenson after her resignation despite Ms. Swenson including in her exit questionnaire that she was in possession of copies of communications at ATCO about challenges she faced. (Brotherton Dep. At 108:12-14; Ex. M). Ms. Swenson specified in this questionnaire that her direct supervisor communicated with her in a "negative, accusatory, or attacking" manner. (Ex. M).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Sixth Circuit has urged caution in granting summary judgment for an employer once a Claimant establishes a prima facie case because "an employer's true motivations are particularly difficult to ascertain" and are "elusive." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8, 101 S. Ct. 1089, 1094 n.8 (1981)).

Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). *See Harris v. JB Robinson Jewelers*, 627 F. 3d 235, 239 (6th Cir. 2010) (testimony alone can be sufficient to create a jury question regarding an issue of material fact); *Walker v. Davis*, 649 F. 3d 502, 505 (6th Cir. 2011) ("At the summary judgment stage, the relevant facts are the Claimant's version of the facts…"). In this case, genuine issues of material facts exist making summary judgment inappropriate.

## III. ARGUMENT

Here, Defendant cannot carry its burden of showing there are no material facts in dispute, particularly when all facts and inferences are viewed in Plaintiff's favor, as they must be. Therefore, Defendant's motion for summary judgment should be denied.

  a. <u>Plaintiff can establish a claim of disability discrimination.</u>

Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To make out a *prima facie* case of employment discrimination through indirect evidence, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Cady v. Remington Arms Co.,* 665 F. App'x 413, 419 (6th Cir. 2016) *(*quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.,* 484 F.3d 357, 365 (6th Cir. 2007)). It is undisputed that Plaintiff was qualified for her position.

  i. *Plaintiff is disabled.*

Under the ADA, the term disabled means "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment" 42 U.S.C. § 12102(2). The 2008 amendments to the ADA further clarified that "[t]he definition of disability" under the ADA "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). In the 2008 amendments to the ADA, Congress also expanded the class of major life activities to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,

standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 3(2)(A). "An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

While Defendant declined to address whether or not Plaintiff is disabled, it should be undisputed. Throughout her employment, Ms. Swenson suffered from mental illness which she first disclosed to Defendant in August 2021 because she required inpatient mental health treatment. (Ex. C; Brotherton Dep. at 74:2-11). Later, in December 2021, Plaintiff disclosed to Ms. Rhoden that she suffered from PTSD. (Swenson Dep. at 71:20-72:4). Ms. Swenson further explained a need for time off in order to avoid mental health crisis. (*Id.* at 72:7-16). Ms. Swenson clearly qualifies as disabled as her mental illness and PTSD substantially limited her ability to work, sleep, focus, communicate, and concentrate on at least some occasions.

> ii. *Plaintiff was otherwise qualified for her position.*

Defendant again declined to address whether or not Plaintiff was otherwise qualified for her position. This should, again, not be in dispute. Ms. Brotherton testified that that Ms. Swenson's job performance was "exemplary." (Brotherton Dep.at 46:3-5). Ms. Swenson also never received any performance-based discipline during her employment with ATCO. (Swenson Dep. At 67:5-8). Ms. Swenson was clearly qualified for her position.

> iii. *Defendant knew of Plaintiff's disability.*

A general diagnosis that tends to reveal a disability is sufficient to trigger ADA provisions. *Lee v. City of Columbus*, Ohio, 636 F.3d 245, 253 (6th Cir. 2011). A requirement that an employee present a medical examination is restricted to discovering whether the employee can continue to

fulfill the essential functions of the job. *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 380 (6th Cir. 2007).

Though Defendant also did not address whether it was aware of Ms. Swenson's disability, this fact is not in dispute. Ms. Swenson notified Defendant of her disability when she provided doctor's notes related to it on August 11, 2021 and on March 7, 2022. (Ex. C; Brotherton Dep. At 74:2-11; Ex. A; Ex. D). Ms. Swenson also informed her supervisors and HR on numerous occasions that she needed time off to see her doctor and therapist to avoid a mental health crisis. (Swenson Dep. at 72:7-16). Ms. Swenson scheduled her therapy appointments in advance and gave Defendant reminders about the necessity of these appointments. (*Id.* at 75:24-76:14; 77:15-19). When Ms. Swenson began experiencing withdrawals from her medications in March 2022, she again notified Ms. Brotherton of this and provided a doctor's note. (Ex. D; Ex. A). It should therefore be undisputed that Defendant was aware of Ms. Swenson's disability.

iv. *Plaintiff suffered an adverse employment action.*

"An adverse employment action is a 'materially adverse change in the terms or conditions of ... employment because of [the] employer's conduct.'" *Talley v. Fam. Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1107 (6th Cir. 2008) (internal citations omitted). To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined. *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir. 1999).

Ms. Swenson has established that Defendant constructively terminated her employment. Defendant uses a five-point attendance policy in which an employee receives a point for each

absence. (Brotherton Dep. at 23:8-11; 23:11-14; 23:25-24:4). Defendant then reserves the right to terminate employment (Eckles Dep. at 31:22-32:2). Defendant does not have any exceptions to this policy and issues points even when an employee has a doctor's note. (Brotherton Dep. at 24:19-22).

Prior to her resignation, Defendant began issuing attendance points to Ms. Swenson when she had planned absences supported by doctor's notes. (Ex. B). Defendant began contemplating whether or not Ms. Swenson was getting close to five points in March 3, 2022. (*Id.*). Defendant's refusal to accommodate Ms. Swenson also led to her further mental decline, and, ultimately, severe withdrawals from medication. (Ex. A; Ex. K). A reasonable jury could certainly find that Defendant had begun contemplating Ms. Swenson's termination at this point.

Ms. Swenson also provided documentation which referred to one of her supervisors, Ms. Rhoden, telling her that if she left she "probably [doesn't] have a job." (Ex. L). Defendant has not disputed this occurred. Not only was Defendant issuing Ms. Swenson attendance points that are well-established to lead to termination, but they in fact informed her that her job was in question. The facts are clear that Defendant intended to terminate Ms. Swenson, Ms. Swenson objectively believed her job was in question. As a result, Ms. Swenson resigned from her position in lieu of termination.

> v. *Defendant replaced Plaintiff with an individual(s) outside of her protected class.*

After Ms. Swenson's constructive discharge, Ms. Rhoden and Ms. Brotherton took over Ms. Swenson's job duties. (Brotherton Dep. At 114:25-115:7). Neither Ms. Brotherton nor Ms. Rhoden are regarded as disabled. (*Id.* At 115:8-10). Ultimately, Christian Dominguez permanently replaced Ms. Swenson. (*Id.* At 117:4-8). Ms. Dominguez is not regarded as disabled to Defendant's

knowledge. (*Id*. At 117:9-13). The record clearly establishes that Defendant replaced Ms. Swenson with individuals outside of her protected class.

### b. Plaintiff can establish that Defendant failed to accommodate her disability.

Impermissible discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To establish a claim for failure to accommodate, a plaintiff must show that [she] was disabled and able to perform the essential functions of [her] job with or without reasonable accommodations. *Camp v. Bi-Lo, LLC*, 662 F. App'x 357, 364 (6th Cir. 2016). The plaintiff must also prove that the employer was aware of the disability and denied his specific reasonable accommodations. *Id*. The employee is not required to make specific reference to a "disability" or "accommodation", but only to sufficiently indicate that their intent is to request a reasonable accommodation. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (internal citations and quotations omitted).

Defendant's assertion that all of Ms. Swenson's were requests were granted is unsupported by the record. Ms. Swenson required in-person therapy once every two weeks. (Swenson Dep. at 72:17-23). Ms. Swenson reminded Ms. Rhoden in person and via text of these appointments. (*Id.* at 75:24-76:3). However, rather than allowing Ms. Swenson to attend these appointments, Defendant instructed her to reschedule them due to a lack of coverage for her job duties. (*Id.* at 77:9-15; 77:25-78:6). Ms. Swenson testified Defendant required her to cancel or reschedule doctor's appointments on multiple occasions because of a lack of coverage. (*Id.* at 128:17-129:3).

In February 2022 Ms. Swenson requested two days off from her travel role in order to see her therapist. (*Id.* at 31:18-32:2). Defendant again denied this request, citing a lack of coverage.

(*Id.* at 32:1-2; 32:6-8). Ms. Swenson then asked to leave the facility she had been assigned to in order to pick up essential medications in order to avoid withdrawals. (*Id.* at 188:9-13; 189:1-4). Defendant again denied this request even though employees were permitted to leave the facility during their workday. (Swenson Dep. at 188:9-13; 189:1-4 Brotherton Dep. at 52:15-18).

Despite Defendant's assertions that Ms. Swenson's accommodations were denied because of a lack of coverage, Defendant has a specific team designed to cover absences without notice. (Brotherton Dep. at 102:12-103:14). The record is clear that Defendant denied Ms. Swenson's requests for accommodations on multiple occasions. Defendant's decision to deny these accommodations can only be attributed to their discriminatory motive.

### c. Defendant Failed to Engage in the Interactive Process

The ADA's regulations provide "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

Although not explicitly stated in the ADA statute, the Sixth Circuit has required the interactive process and required both parties to participate in good faith. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008). "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). A plaintiff may establish an independent ADA violation for a failure to engage in the interactive process if she makes a prima facie showing she proposed a reasonable accommodation or that a

reasonable accommodation was possible. *Boyte v. Shulkin*, No. 3:16-cv-02799, 2018 U.S. Dist. LEXIS 25044, at *9 (M.D. Tenn. Feb. 14, 2018).

Plaintiff has demonstrated that she proposed a reasonable accommodation. Ms. Swenson requested time off to attend bi-monthly therapy appointments, a brief leave for inpatient mental health treatment, and the ability to leave the facility Defendant assigned her to in order to pick up essential medications. (Ex. C; Brotherton Dep. At 74:2-11; Swenson Dep. at 72:7-16; Swenson Dep. at 76:4-6; 76:11-1; 77:15-19; 112:5-13). Defendant denied these requests.

Despite Defendant's assertions that Ms. Swenson's accommodations were denied because of a lack of coverage, Defendant has a specific team designed to cover absences without notice. (Brotherton Dep. At 102:12-103:14). The record is clear that Defendant denied Ms. Swenson's requests for accommodations on multiple occasions without providing any alternatives. Defendant denied these repeated requests for accommodation despite their clear feasibility. Rather than suggest alternatives, Defendant issued a blanket denial. As a result, Defendant's failure to engage in the interactive process can be clearly established.

### d. Plaintiff can establish that Defendant retaliated against her.

To establish a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 304 (6th Cir. 2019). Here, Ms. Swenson demonstrates a causal connection between her disability and her termination.

### i. *Plaintiff engaged in a protected activity.*

Ms. Swenson clearly engaged in a protected activity when she requested to attend medical appointments necessary to maintain her disability and Defendant repeatedly did not allow Ms. Swenson to do so. Ms. Swenson typically attended in-person therapy once every two weeks. (Swenson Dep. at 72:17-23). When Ms. Swenson made therapy appointments, she gave Defendant notice the day she scheduled the appointment and a week prior as a follow up. (*Id*. at 75:24-76:3). Ms. Swenson reminded Defendant, specifically Ms. Rhoden, both in person and via text. (Swenson Dep. at 76:4-6; 76:11-14). Ms. Swenson made it clear to Defendant that she needed to attend these appointments in order to maintain her medications. (*Id.* at 77:15-19). Ms. Swenson also asked to leave early for doctor or therapy appointments and was denied this accommodation as well. (*Id.* at 112:5-13). Throughout her employment, Ms. Swenson would be expected to cancel or reschedule these appointments given the demands of Defendants schedules. (*Id.* at 77:9-15; 77:25-78:6; 115:19-23; 120:4-9). At times, Ms. Swenson would go as long as a month and half without attending her therapy appointments as scheduled. (*Id.* at 78:10-13). There is no question that Defendant knew Ms. Swenson was requesting time off for medical appointments. As such, Defendant was on notice that Ms. Swenson was requesting accommodation for her disability satisfying the first element.

Ms. Swenson also engaged in a protected activity when she made complaints about not receiving accommodations. As early as November 30, 2021, Ms. Swenson reported to Defendant's human resources that her complaints had not been properly addressed. (Pl. SAMF ¶ 13). Ms. Swenson again complained about not receiving accommodations on March 7, 2022. (Ex. I). Defendant acknowledges that this email constituted Ms. Swenson not receiving accommodations.

  ii. *Defendant knew of Plaintiff's protected activity.*

Defendant frequently communicated with Plaintiff about her requests for accommodation which demonstrates their awareness of the protected activity. Specifically, on March 7, 2022, Ms. Swenson emailed Ms. Brotherton absences and withdrawals she had experienced as a result of not taking necessary medications or attending necessary doctor's appointments because of her work schedule. (Ex. I). Defendant testified that this email constituted Ms. Swenson complaining about not receiving accommodations, which in turn, would represent their acknowledgment of her engaging in a protected activity. (Eckles Dep. at 33:4-9). Additionally, Defendant further testified that this email appeared to be relating to a previous request for accommodation. (*Id.* at 33:11-12).

### iii. *Defendant took an adverse employment action against Plaintiff.*

Defendant took an adverse employment action against Ms. Swenson evidenced by her constructive discharge as demonstrated herein. In her resignation letter, Ms. Swenson describes her working environment as "toxic" and states, "As you know, I have discussed with you my struggles about the various issues of unfairness, nepotism, and just an overall mentally unhealthy environment for me." (Ex. J). Clearly Ms. Swenson is reiterating previous conversations and complaints made to/with Defendant. Ms. Swenson sent Ms. Brotherton a letter only a few weeks earlier on March 7, 2022 about her mental health. (Ex. I). Ms. Swenson's resignation letter encompasses the totality of her complaints and denials of requests for accommodation which ultimately resulted in her constructed discharge.

### iv. *There was a causal connection between the protected activity and adverse employment action.*

In the Sixth Circuit, when "an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a

prima facie case of retaliation." *Sesson v. United Parcel Serv., Inc.*, No. 3:19-CV-01165, 2022 WL 2033331, at *15 (M.D. Tenn. June 6, 2022) (Quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Ms. Swenson has clearly established causation. After Ms. Swenson began requesting accommodations in the form of time off to attend therapy, doctor's appointments, and pick up medication, Defendant began designating points to her which would ultimately result in her termination. (Brotherton Dep. at 23:8-11; Eckles Dep. at 31:22-32:2; Ex. B). Ms. Swenson reported to HR on November 30, 2021 that she felt her concerns were not being address, and on December 1, 2021 Defendant began designating her absence points even with a doctor's note. (Ex. B; Ex. G). Ms. Rhoden also told Ms. Swenson that she probably would not have a job if she left. (Ex. L). Defendant also created an intolerable work environment in which Ms. Swenson could not obtain necessary medication that, as a direct result, drove Ms. Swenson to resign in order to protect her health. A reasonable jury could certainly find that as a direct result of the repeated denial of Ms. Swenson's accommodations, resulting retaliation, and the message that she probably does not have a job, she was forced to resign.

### IV. CONCLUSION

Defendant cannot meet its burden viewing the evidence in light most favorable to Ms. Swenson, and she respectfully requests the Court deny Defendant's motion for summary judgment.

Respectfully submitted,

**THE EMPLOYMENT & CONSUMER LAW GROUP**

*/s/ LAUREN IRWIN*
**G. BRANDON HALL, BPR No. 034027**
**LAUREN IRWIN, BPR No. 038433**
**EMILY COSTANZO, BPR No. 041447**
1720 West End Ave., Suite 402

19
Case 3:23-cv-00590   Document 49   Filed 07/12/24   Page 19 of 20 PageID #: 1280

Nashville, TN 37203
(615) 850-0632
bhall@eclaw.com
lauren@eclaw.com
emily@eclaw.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was served via the Court's electronic filing system on July 12, 2024 to the following:

Matthew S. Disbrow, MI Bar No. P65378
(admitted pro hac vice)
Michael J. Dauphinais, MI Bar No. 84158
(admitted pro hac vice)
HONIGMAN LLP
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7372
mdisbrow@honigman.com

Kenneth A. Weber, TN BPR. No. 015730
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, P.C.
1600 West End Ave., Suite 2000
Nashville, TN 37203
kweber@bakerdonelson.com

*Attorneys for Defendant*

*/s/ Lauren Irwin*